**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ARAMARK CORRECTIONAL SERVICES, LLC,** | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | **Case No. 12 C 6148** |
| **COUNTY OF COOK,** | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Aramark Correctional Services, LLC, has sued Cook County in connection with the County's recent award of the food services contract for the Cook County Department of Corrections (DOC). The County issued a request for proposals (RFP), and the only two bidders were Aramark, which is the current contractor, and CBM Managed Services (CBM). The County awarded the contract to CBM.

Aramark has moved for a preliminary injunction barring the County from awarding the contract to CBM. The County has moved to dismiss Aramark's claims for lack of standing and failure to state a claim. The Court held an evidentiary hearing on the motion for preliminary injunction on September 5-6, 2012. For the reasons stated below, the Court denies the County's motion to dismiss and also denies Aramark's motion for a preliminary injunction. This constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(2).

**Background**

Aramark is the current food services vendor for the DOC pursuant to a contract that, following several extensions, expires on September 10, 2012. On October 17, 2011, the County issued an RFP to solicit proposals for a new DOC food services contract. The DOC, which is operated by the Cook County Sheriff, includes the Cook County Jail, a facility that houses approximately 9,600 inmates at any given time. Ex. 42 at 1 (Provision 1.1).

The Cook County Procurement Code allows the County to pursue an RFP process rather than competitive bidding when it is determined to be in the County's best interests to do so. Ex. 33 at 10 (Procurement Code § 34-138). The RFP process allows the County to negotiate with multiple bidders and allows consideration of qualitative factors in addition to the bid price. *Id.*

The RFP that the County issued for the food services contract gave instructions to bidders (Provision 4) and listed the requirements for submission of a proposal (Provision 7.2). Ex. 42 at 42, 60. RFP Provision 7.2.5 required bidders to "demonstrate good faith efforts" to satisfy the goals listed in the County's Minority and Woman-Owned Business Enterprises Ordinance (M/WBE Ordinance) and the RFP itself. *Id.* at 62. The RFP also described the criteria for evaluating proposals. *Id.* at 59 (Provision 6). In the RFP, the County "reserve[d] the right to waive or permit cure of non-material irregularities," including those that do not reflect "material change in the RFP." *Id.* at 56 (Provision 4.29).

Under the RFP, proposals were due on November 14, 2011. Only two companies, Aramark and CBM, submitted proposals in response to the RFP. CBM's

utilization plan for minority and women-owned businesses stated that Airport Restaurant Management, Inc. (ARMI), which CBM said was a "Cook County Government-certified" minority-owned business enterprise (MBE), would serve as a subcontractor, providing thirty-six percent of the value of the contract.  Ex. 50 at 901–05.  CBM's utilization plan also included a letter of certification from the County's Office of Contract Compliance, which indicated that ARMI's certification would expire on March 16, 2012.  *Id.* at 904.

Brandie Knazze, Deputy to the Chief Procurement Officer, testified at the preliminary injunction hearing that once the County received the proposals, it did an initial evaluation of each bid's compliance with the terms of the RFP.  On December 21, 2011, Contract Compliance Director LaVerne Hall determined that CBM's utilization plan complied with the WBE and MBE goals set forth in the M/WBE Ordinance and the RFP.  Ex. 11 at 2086.

Knazze testified that after the initial evaluation, an evaluation committee reviewed the proposals and established an initial score for each proposal.  As directed by the RFP, the evaluation committee was composed of County and Sheriff's Department personnel.  Ex. 42 at 56 (Provision 5.3).  Sometime around December 19, 2011, both CBM and Aramark gave oral presentations and met with the County to clarify the terms of their proposals.

Knazze testified that the evaluation committee completed its evaluation on May 2, 2012 and recommended that the County award the food services contract to CBM. The committee issued a report detailing its findings and the process it followed in evaluating the proposals.  Ex. 1A.  The report discussed how the committee rated Aramark and CBM on each of the eight technical criteria listed in Provision 6.2 of the

RFP.  Ex. 1A at 2–9.  The report also laid out the overall price proposed by each bidder. *Id.* at 9–10.

The evaluation committee determined that CBM had submitted a "Highly Qualified & Best Value Proposal" and that Aramark was "Less Qualified."  *Id.* at 10.  The committee also issued a scorecard of sorts, grading the proposals on each of the eight technical criteria and listing their price proposals.  Ex. 1 at 788–89.  The committee ranked CBM's proposal higher in every category except for "Financial Stability of the Proposer," giving Aramark an "Excellent" rating in that category and CBM a "Good" rating.  *Id.*; *see also* Ex. 42 at 59 (Provision 6.2.6) (listing financial stability as one of the technical evaluation criteria).  The committee's report recommended CBM for the contract award, noting that "the determining factor is [*sic*] the qualifications of the firm and the best value/pricing solution to the County."  Ex. 1A at 10.

Knazze testified that based on the evaluation committee's recommendation, the County entered into negotiations with CBM on May 15–16, 2012.  CBM withdrew its proposal on two occasions after that, and on June 28, 2012, the County entered into negotiations with Aramark.  CBM then rescinded its withdrawal, and the County permitted it to reenter negotiations.  After concluding negotiations with both CBM and Aramark, County personnel recommended CBM for the contract award.

On July 6, 2012, Chief Procurement Officer (CPO) Lourdes Coss, Sheriff Thomas Dart, and Alexis Herrera, the chief financial officer of the Sheriff's Office, sent a request to the Cook County Board of Commissioners (County Board) for approval of the proposed contract with CBM.  Ex. 19.  At its meeting on July 10, 2012, the County Board referred the matter to the Finance Committee.

On July 18, 2012, Hall advised CPO Coss in writing that CBM's bid was "responsive to the service goals" listed in the RFP and the M/WBE Ordinance. Ex. 16 at 1152. Hall's memorandum to Coss listed the M/WBE firms that CBM planned to use, identifying the percentage of the contract's value attributable to each firm and the agency that had certified the firm as an M/WBE. *Id.* ARMI was the only MBE that CBM included in its utilization plan, *see* Ex. 50 at 901, and Hall's memorandum stated that ARMI had been certified as an MBE by the City of Chicago. Ex. 16 at 1152.

The Finance Committee approved the proposed contract on July 24, 2012 after conducting a hearing the day before that lasted approximately three hours. Ex. 17 at 10624. The contract between the County and CBM is currently scheduled to take effect at the end of the day on Monday, September 10, 2012.

During the course of the RFP process, CBM advised the County that if it were awarded the food services contract, it planned to assign the contract to CBM Premier Management, LLC (CBM Premier). Am. Compl. ¶ 24. CBM's CEO, Marlin Sejnoha, informed the procurement office on February 1, 2012, that CBM Premier was owned by two subcontractors, ARMI and The Buona Companies, LLC, along with a third company, HMS, LLC. Ex. 38 at 1320. Sejnoha stated that HMS "has experience in food service and restaurant management." *Id.* The County did not conduct any further investigation into HMS or its qualifications prior to making the contract award.

ARMI, a one-third owner of CBM Premier and the only MBE listed in CBM's utilization plan, is currently certified by the City of Chicago as an MBE. Ex. 50 at 901; Ex. 16 at 1152. Hall testified that ARMI had long been certified as an MBE by the County as well. In July 2011, however, the County Board changed its W/MBE

Ordinance and requirements for certification. Ex. 33 at 38 (Procurement Code § 34-268). As of the date of the contract award at issue here, the County required a firm to be owned by an "economically disadvantaged" individual, defined as a person with a "Personal Net Worth less than $2,000,000.00." *Id.* at 34 (Procurement Code § 34-263). In connection with this lawsuit, ARMI's President and majority owner, Timothy Rand, submitted an affidavit affirming that his personal net worth exceeds $2 million. Ex. 52. It is therefore undisputed that ARMI does not currently qualify for certification by the County.

Hall testified that as a matter of practice, the Office of Contract Compliance does not do a thorough investigation of every subcontractor in a bidder's utilization plan until after a contract has been awarded. Instead, the Office's pre-award evaluation of a proposal's utilization plan consists of verifying that the subcontractors listed in the plan are currently certified by an identified agency and that the total level of commitment by those subcontractors meets the identified M/WBE goals. The Office of Contract Compliance did that in this case. Hall explained that she did not conduct a more detailed investigation into ARMI at this point in the process because, as a general rule, it would impede the overall RFP process were the Office to conduct a complete investigation of each M/WBE subcontractor in all submitted proposals.

Hall further testified that once a contract award has been made and the prevailing bidder's M/WBE utilization plan has been incorporated into the contract, the Office of Contract Compliance conducts a more thorough review to assess what actions are necessary to ensure each subcontractor's M/WBE status before actually including a firm as part of the contract's overall M/WBE participation. She testified that during this

review, it is common for the contract awardee's utilization plan to be modified for various reasons.  Hall did not regard these sorts of modifications as material variations with regard to the RFP, and there is no evidence to the contrary.

In her testimony at the hearing, Hall conceded that at the time she conducted the pre-award evaluation of CBM's proposal, she overlooked the difference between Cook County's M/WBE provisions, which require firms to be economically disadvantaged, and the City of Chicago's requirements, which do not.  Thus despite ARMI's inability to qualify as a Cook County MBE, CBM's utilization plan was incorporated into its contract with the County, binding CBM to its commitment to use MBEs to provide thirty-six percent of the contract value.  Ex. 17 at 5.  Hall's oversight was brought to her attention (likely as a result of this lawsuit) by the time of an orientation meeting with CBM and CBM Premier staff on August 21, 2012.  At that meeting, Hall told the CBM representatives that the Office of Contract Compliance needed ARMI to complete a "Personal Net Worth Statement," Ex. 3, before its utilization could be counted toward the W/MBE commitment in CBM's contract.  A member of CBM Premier's staff asked Hall whether the company could use other MBEs to fulfill its obligations if ARMI could not qualify as a County MBE.  Later that day, Hall wrote to ARMI's President, requesting financial documentation to ensure ARMI's compliance with the economic disadvantage requirement of the M/WBE Ordinance.  Ex. 4.  As indicated above, it is undisputed that ARMI does not meet that requirement and thus is ineligible for County certification.  Ex. 52.

The evidence at the hearing established that the County and CBM are currently taking steps to rectify the defect in CBM's M/WBE utilization resulting from ARMI's

inability to obtain County MBE certification. Ex. 55. The Court also notes that at the hearing, there was credible testimony that the fact that CBM's utilization plan proposed a higher percentage of M/WBE participation than the County's stated goals did not have a material impact on the recommended award of the contract to CBM.

As indicated earlier, the Court conducted a hearing on Aramark's motion for a preliminary injunction on September 5–6, 2012. Four County employees testified, including CPO Coss, Deputy CPO Knazze, Contract Compliance Director Hall, and Cook County Sheriff's Office CFO Herrera.

## Discussion

## I. The County's motion to dismiss

The County has moved to dismiss Aramark's complaint on two grounds: (1) lack of standing under Rule 12(b)(1), and (2) failure to state a claim under Rule 12(b)(6).

### A. Standing

"[T]he requirements of Article III case-or-controversy standing are threefold: (1) an injury in-fact; (2) fairly traceable to the defendant's action; and (3) capable of being redressed by a favorable decision from the court." *Parvati Corp. v. City of Oak Forest*, 630 F.3d 512, 516 (7th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). An "injury in fact" consists of an "invasion of a legally protected interest that is concrete and particularized and, thus, actual or imminent, not conjectural or hypothetical." *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003). The plaintiff bears the burden of establishing standing. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). Cook County argues that the plaintiff lacks standing

because it has not shown any injury in fact resulting from the County's actions. Def.'s Mem. at 5.

The requirement that Aramark must suffer invasion of a legally protected interest is a principle of federal constitutional law. *Scanlan v. Eisenberg*, 669 F.3d 838, 842 (7th Cir. 2012). But a properly-pleaded violation of a state-created legal right may satisfy Article III's injury requirement. *FMC Corp. v. Boesky*, 852 F.2d 981 (7th Cir. 1988).

Since as early as 1979, Illinois courts have recognized that "a bidder denied a contract because it was awarded to an unqualified bidder" has standing to file suit under Illinois law. *Stanley Magic-Door, Inc. v. City of Chicago*, 74 Ill. App. 3d 595, 597, 393 N.E.2d 535, 536–37 (1979). The court in *Stanley* noted that federal courts recognize a disappointed bidder's standing and that state courts generally recognize standing by any person who "shows that he was in fact aggrieved" by the governmental decision. *Id.* at 597, 393 N.E.2d at 537.

Although Aramark is not *entitled* to the contract if the Court grants it relief, it nonetheless has a "right to participate in a fair bidding process." *Walsh/II in One Joint Venture III v. Metro. Water Reclamation Dist. of Greater Chicago*, 389 Ill. App. 3d 138, 147, 904 N.E.2d 1158, 1166 (2009) (citing *Keefe-Shea Joint Venture v. City of Evanston*, 332 Ill. App. 3d 163, 170, 773 N.E.2d 1155, 1160 (2002)); *see also Court St. Steak House, Inc. v. Cnty. of Tazewell*, 163 Ill. 2d 159, 165, 643 N.E.2d 781, 784 (1994) (permitting an unsuccessful bidder to seek a writ of mandamus against the county regarding its contract award); *Bodine Elec. of Champaign v. City of Champaign*, 305 Ill.App.3d 431, 433, 711 N.E.2d 471, 473 (1999) (permitting an unsuccessful bidder to bring suit against the municipality regarding its allegedly improper contract award). The

alleged violation of this right is sufficient to confer standing. The Court also notes that as the only other bidder for the food services contract, there is at least a reasonable likelihood that Aramark would have been awarded the contract had the County not awarded it to CBM due to deficiencies in its proposal.

In arguing that standing is lacking, the County relies on the Seventh Circuit's statement in *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073 (7th Cir. 1987), that "no one has an entitlement to receive [a] contract." *Id.* at 1080. *Szabo*, however, concerned a different issue – whether a disappointed bidder had a property interest in the contract that entitled it to protection under the Due Process Clause of the Fourteenth Amendment. *Id.* The case does not suggest that Aramark lacks standing to sue.

"[The] standing inquiry does not necessarily end with the determination of a state right to sue." *Scanlan*, 669 F.3d at 845. But the Seventh Circuit stated in *Scanlan* that "where parties have 'long been permitted to bring' the type of suit at issue, it is 'well nigh conclusive' that Article III standing exists." *Id.* at 845 (quoting *Sprint Commc'n Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 274–75 (2008)). In the present case, Illinois courts have consistently allowed disappointed bidders to bring suit against the local government entity that allegedly deprived them of a fair bidding process. Because Aramark has alleged violation of its right to participate in such a process, it has standing to bring suit against the County for vindication of that right.

## B.    Failure to state a claim

On a motion to dismiss under Rule 12(b)(6), the Court accepts the facts stated in the complaint as true and draws reasonable inferences in favor of the plaintiff. *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive the defendant's motion, the complaint must include enough facts to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

In its reply brief, the County concedes that its decision to award the food services contract to CBM is subject to judicial review for "fraud or arbitrary conduct." Def.'s Reply at 4. Taking this as the standard for purposes of the motion to dismiss, Aramark's complaint alleges enough to give rise to a plausible claim of arbitrary or fraudulent conduct. Among other things, Aramark's extensive allegations regarding the County's conduct of the RFP process are sufficient to give rise to a plausible inference of arbitrary conduct. *See, e.g.,* Am. Compl. ¶¶ 20–23, 28–29.

At the preliminary injunction hearing, Aramark pursued only a limited subset of the allegations set forth in its amended complaint. For purposes of the motion to dismiss, however, the Court considers only the complaint, not the evidence adduced at the hearing. As described above, those allegations are sufficient to state a claim.

## II.    Aramark's motion for preliminary injunction

Aramark asks the Court for a preliminary injunction to prevent the County from performing under the recently adopted contract with CBM for food services at the Cook

County Jail, which is scheduled to take effect at the end of the day on September 10, 2012. To obtain a preliminary injunction, Aramark must show: "that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits." *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). "If the moving party meets these threshold requirements, the district court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Id.*

Aramark contends that the County's actions were contrary to both the County's Procurement Code and the RFP. The Court will deal with each contention in turn.

### A. The Procurement Code

Cook County is a home rule entity. Ill. Const. art. VII, § 6. Under the Illinois Constitution, "a home rule unit may exercise any power and perform any function pertaining to its government and affairs." *Id.* It then instructs that these "[p]owers and functions of home rule units shall be construed liberally." *Id.* In *Landmarks Preservation Council v. City of Chicago*, 125 Ill. 2d 164, 531 N.E.2d 9 (1988), the Illinois Supreme Court ruled that when a home rule entity is involved, "court[s] cannot handle matters which in effect are attempts to overrule decisions of a legislative body based upon [an] alleged failure to follow requirements imposed by that body itself." *Id.* at 179, 531 N.E.2d at 15 (internal quotation marks omitted).

The court in *Landmarks* relied on its earlier decision in *Illinois Gasoline Dealers Association v. City of Chicago*, 119 Ill.2d 391, 519 N.E.2d 447 (1988), which forbade judicial inquiry into a home rule legislature's failure to follow its own rules. *Id.* at 404,

519 N.E.2d at 452–53. The court in *Illinois Gasoline Dealers Association* ruled that "[w]e have authority to invalidate legislation adopted by the city council only upon grounds that the enactment violates a provision of the Federal or State constitutions or violates the mandate of a State or Federal statute." *Id.* at 404, 519 N.E.2d at 453. In the present case, no such federal or state constitutional or statutory mandates exist.

More recently, the Illinois appellate court has held that home rule entities canot be compelled to follow their own ordinances relating to contracting unless explicitly directed to do so by the state legislature. *DMS Pharm. Grp. v. Cnty. of Cook*, 345 Ill. App. 3d 430, 442, 803 N.E.2d 151, 161 (2004); *Amer. Health Care Providers, Inc. v. Cnty. of Cook*, 265 Ill. App. 3d 919, 924–25, 638 N.E.2d 772, 777 (1994) (citing *Landmarks*, 125 Ill. 2d 164 at 178–82, 531 N.E.2d at 15–17). *DMS Pharmaceutical Group* and *American Health Care* both involved decisions by Cook County not to abide by its own ordinances regulating the procurement of contracts with the county. *DMS Pharm. Grp.*, 345 Ill. App. 3d at 434, 803 N.E.2d at 154–55 (addressing a challenge to the County's decision not to let a public contract through competitive bidding); *Amer. Health Care*, 265 Ill. App. 3d at 921, 638 N.E.2d at 774–75 (same). In each case, the county delegated the task of procurement to an individual or agency and approved the recommended contract award. *DMS Pharm. Grp.*, 345 Ill. App. 3d at 433–34, 803 N.E.2d at 154; *Amer. Health Care*, 265 Ill. App. 3d at 921, 638 N.E.2d at 774.

As indicated earlier, the Illinois Constitution provides that a home rule unit may exercise powers "pertaining to its government and affairs." Ill. Const. art. VII, § 6. The court in *American Health Care* noted that a home rule entity's ordinance pertains to its government and affairs within the protection of the state constitution when it "relates to

problems that are local in nature rather than State or national." *Amer. Health Care*, 265 Ill. App. 3d at 925–26, 638 N.E.2d at 777. The court then concluded that the County's procurement of a public contract related to a problem "overwhelmingly local in nature," and thus was protected from judicial review by Article VII of the Illinois Constitution. *Id.* at 926, 638 N.E.2d at 777; *see also DMS Pharm. Grp.*, 345 Ill. App. 3d at 440, 803 N.E.2d at 159.

In *DMS Pharmaceutical Group*, the plaintiff argued that *American Health Care* did not apply because the County's actions in its case were administrative in nature and therefore subject to judicial review for compliance with the County's ordinances. *DMS*, 345 Ill. App. 3d at 440, 803 N.E.2d at 159. The court rejected the plaintiff's argument, finding the County's actions legislative in nature because "the Board in this case was not acting pursuant to a specific ordinance prescribing the guidelines for its action." *Id.* at 441, 803 N.E.2d at 160.

Aramark argues that the County nonetheless should be held to the requirements of its Procurement Code, for two reasons: (1) *American Health Care* and *DMS Pharmaceutical Group* do not foreclose judicial inquiry into a County's compliance with its own ordinances when the County acts in an administrative, rather than a legislative, capacity; and (2) the County purported to be acting in accordance with the M/WBE Ordinance contained in the Procurement Code when it issued the RFP, and thus it should be bound by that ordinance.

Aramark contends that neither *American Health Care* nor *DMS Pharmaceutical Group* stand for the proposition that a contract award is always a legislative action, and that in this case, the County acted in an administrative, rather than a legislative

capacity. Aramark essentially urges the Court to confine the decision in *DMS Pharmaceutical Group* to its facts. But Aramark's argument is unpersuasive given the factual similarities between this case and both *DMS Pharmaceutical Group* and *American Health Care*. Both decisions involved an RFP process that was overseen by Cook County personnel and a contract award that was ultimately approved by the County Board. *DMS Pharm. Grp.*, 345 Ill. App. 3d at 433–34, 803 N.E.2d at 154–55; *Amer. Health Care*, 265 Ill. App.3d at 921, 638 N.E.2d at 774–75. Moreover, even if the Court were to find that the County was required to follow its own procedural rules for the RFP process, discussed in section 34-138 of the Code, Aramark has not shown that the County violated those rules in any way. Ex. 33 at 10.

Aramark also contends that because the RFP purported to be acting in compliance with the M/WBE Ordinance, the County should be bound by the ordinance's requirements. *See* Pl.'s Opp'n at 8. Aramark relies on Provision 4.15 of the RFP, which advises that the goal of M/WBE participation in the food services contract is consistent with the County's M/WBE Ordinance. Ex. 42 at 53. Aramark fails, however, to meaningfully distinguish the M/WBE Ordinance at issue here from the minority-business ordinance in *American Health Care* that the court found to be non-binding and merely aspirational. *Amer. Health Care*, 265 Ill. App. 3d at 924, 638 N.E.2d at 776. The court in *American Health Care* found that the minority-business ordinance did not confer any substantive rights on bidders and that to decide otherwise "could cause [the ordinance] to violate the equal protection clause." *Id.* Aramark's claim that the County was bound by the M/WBE Ordinance in the Procurement Code therefore fails.

For these reasons, the Court concludes that Aramark has not shown that it has any likelihood of success on its contention that the contract award should be enjoined because the County failed to follow the Cook County Procurement Code.

## B.     The RFP

Aramark also argues that the County violated the terms of its own RFP in awarding CBM the food services contract.  Aramark contends that under Illinois law, it is entitled to prevail if it can show that the County awarded the contract to CBM even though its proposal varied materially from the terms of the RFP.  Aramark contends that one of CBM's key MBE subcontractors did not actually qualify for MBE status; County staff personnel did not verify the subcontractor's MBE status before approving the proposal and led the County Board to believe that the proposal complied with M/WBE goals; and that the County failed to assess the financial stability of HMS, LLC, which has a one-third interest in CBM Premier (the company to which CBM plans to assign the contract).

In support of its argument, Aramark relies on *Bodine Electric*.  By contrast, the County argues that because Cook County is a home rule unit, its decision to award CBM the contract may not be set aside "absent fraud or arbitrary conduct."  Def.'s Reply at 4.

The Illinois Appellate Court has held that "bids must conform to the advertised requirements of the invitation to bid."  *See, e.g., Keefe-Shea Joint Venture*, 332 Ill. App. 3d at 171, 773 N.E.2d at 1161; *Smith v. Intergovernmental Solid Waste Disposal Ass'n*, 239 Ill. App. 3d 123, 142, 605 N.E.2d 654, 666 (1992); *Leo Michuda & Son Co. v. Metro. Sanitary Dist. of Greater Chicago*, 97 Ill. App. 3d 340, 344, 422 N.E.2d 1078,

1082 (1981). The court in *Michuda* concluded that this general rule requires the rejection of a bid containing a "material variance" from the invitation to bid, thus entitling a disappointed bidder to judicial relief if a contract award was made despite such a material variance. *Michuda*, 97 Ill.App.3d at 344, 422 N.E.2d at 1082. The court defined a material variance as one that "gives a bidder a substantial advantage or benefit not enjoyed by other bidders." *Id.*

Although *Michuda* involved a contract with a non-home rule unit of government, the court in *Bodine Electric* adopted the "material variation" standard and applied it to a home rule unit's contract procurement process. *Bodine Elec.*, 305 Ill.App.3d at 436, 711 N.E.2d at 475. In *Bodine Electric*, the court addressed a disappointed bidder's claim that its bid for a home rule unit's public contract did not vary materially from the bid instructions and that for this reason, the home rule unit was entitled to waive the variance and award it the contract. *Id.* at 433, 711 N.E.2d at 473. The court addressed the merits of the plaintiff's claim and accepted the material variance standard without discussion. *Id.* at 436, 711 N.E.2d at 475. The court in *Bodine Electric* thus indicated that even when the case involves a home rule unit, if the winning bidder's proposal varies materially from the advertised bid requirements, the court can enjoin the award of the contract to that bidder. *See id.*; *see also Michuda*, 97 Ill. App. 3d at 345, 422 N.E.2d at 1083 (affirming the trial court's permanent injunction enjoining performance under a contract that contained a material variance).

Not all Illinois cases on this topic apply this same standard, however, and thus Illinois law regarding the basis on which a court can overturn a public entity's contract award is less than crystal clear. Contrary to *Bodine Electric*, some Illinois cases apply

an arbitrariness standard to the acceptance or rejection of a bid, prohibiting interference of a government entity's award unless its discretion is "exercised with manifest injustice or if a palpable abuse of discretion is clearly shown." *Cardinal Glass Co. v. Bd. of Educ. of Mendota Cmty. Consol. Sch. Dist. No. 289*, 113 Ill. App. 3d 442, 448, 447 N.E.2d 546, 550 (1983); *see also Court St. Steak House*, 163 Ill. 2d at 165, 643 N.E.2d at 784 (prohibiting contract awards made through "fraud, lack of authority, unfair dealing, favoritism, or similar arbitrary conduct by a county").  Although none of the cases that applies an arbitrariness standard involved a home rule entity, as noted earlier the County contents that this is the appropriate standard for assessing the contract award at issue here.

Still other Illinois courts have treated the two standards as effectively the the same and have used them interchangeably.  *See Walsh/II in One Joint Venture III v. Metro. Water Reclamation Dist. of Greater Chicago*, 389 Ill. App. 3d 138, 146–47, 904 N.E.2d 1158, 1166–67 (2009); *Williams Bros. Constr., Inc. v. Pub. Bldg. Comm'n of Kane Cnty.*, 243 Ill. App. 3d 949, 956–57, 612 N.E.2d 890, 895 (1993).  The court in *Williams Brothers Construction* acknowledged that *Michuda* required rejection of proposals that varied materially from the invitation to bid.  *Williams Bros. Constr.*, 243 Ill. App.3d at 756, 612 N.E.2d at 895.  In the very next paragraph of its decision, however, the court stated that a local government entity has "broad discretion in awarding a contract, and a court will defer to the agency's choice absent a palpable abuse of discretion or manifest injustice."  *Id.* at 957, 612 N.E.2d at 895.

The Court need not determine definitively which of these standards applies. Even were the Court to determine that Aramark's "material variance" test is the correct

standard, Aramark has not shown that it is likely to succeed on the merits. Illinois courts give government entities considerable deference in determining whether or not a bid complies with the requirements listed in the advertisement for bids. *Id.* (finding that the discretion in awarding a contract "extends to the determination of whether a given bid is responsive"). Under Illinois law, courts defer to the government entity's decision "so long as that determination has a reasonable basis." *Id.* The scope of the government entity's discretion is even greater where, as here, the municipality is a home rule entity. *Bodine*, 305 Ill.App.3d at 439, 711 N.E.2d at 477 (noting that courts are required to give home rule units deference on material variance determinations).

As indicated earlier, though Aramark's complaint contains numerous allegations regarding irregularities in the contract award process, at the preliminary injunction hearing Aramark expressly confined its motion to two contentions: (1) the County did not determine the qualifications of HMS, LLC, a one-third owner of the entity to which CBM planned to assign the contract, violating Provisions 6.2.5 and 6.2.6 of the RFP; and (2) ARMI, one of CBM's M/WBE contractors, was ineligible under Cook County's rules for MBE certification, yet the County awarded the contract based on an unsupported assumption that ARMI qualified.

At the preliminary injunction hearing, Aramark repeatedly contended that the RFP required the County to investigate and/or verify parts of CBM's proposal. This misses the point, at least for purposes of the claimed material variance standard. The cases on which Aramark relies state that the focus of the inquiry is whether the proposal contained a material variance from the bid requirements, not whether the local government entity's actions were sufficient to discover that variance. *See e.g., Bodine*

*Elec.*, 305 Ill. App. 3d at 439, 711 N.E.2d at 477 (finding material a bidder's failure to submit the full bid bond); *Michuda*, 97 Ill. App. 3d at 345, 422 N.E.2d at 1082–83 (finding material a bidder's failure to submit a required form until after the deadline). Thus, the Court will focus on whether CBM's proposal contained material variances from the RFP.

### 1. HMS

Provisions 6.2.5 and 6.2.6 of the RFP state that proposals will be evaluated, in part, based on the "[q]ualifications and experience of the proposed key personnel as evidenced by relevant experience including correctional food service" and the "Financial Stability of Proposer," respectively. Ex. 42 at 59. "Proposer" is defined by Provision 4.1.2 of the RFP as "the individuals or business entities, if any, submitting a Proposal in response to this RFP." *Id.* at 50.

Aramark focuses this argument on HMS, LLC, a company that owns one-third of CBM Premier, the company to which CBM stated that it intended to assign the contract. Aramark contends that because the County knew that CBM planned to assign the contract CBM Premier upon winning the award, the County was required to investigate both the experience and financial stability of the entities that own CBM Premier— including HMS—as part of its responsibility to evaluate the proposers under the RFP. Ex. 42 at 56 (Provision 5.3) (stating that the proposals will be evaluated based on criteria detailed in the RFP).

As indicated above, however, the RFP contemplated that what was relevant were the qualifications of the "Proposer" as the RFP defined that term. The "Proposer" here was CBM Managed Services, not CBM Premier, HMS, or any other company.

Specifically, CBM Managed Services was the business entity that submitted a proposal to the County. Ex. 50 at 901 (identifying CBM Managed Services as the proposed vendor). For this reason, the RFP required the County to consider only CBM's financial stability, not the financial stability of HMS. The evaluation committee assessed CBM's financial stability, giving it a rating of "Good" and noting in its report that the company "had adequate financials." Ex. 1 at 788–89, Ex.1A at 9. The evaluation committee also considered the qualifications and experience of CBM's key personnel, noting that one of CBM's personnel had "worked previously within the Cook County Department of Corrections food service operation." Ex. 1A at 8. Nothing in Provision 6.2.5 of the RFP suggests that the County was obligated to investigate potential or even likely assignees of the contract prior to awarding the contract in the first place. Thus there was not material variance from the RFP requirements or any other aspect of the advertised bidding process.

Even if Aramark could show that the County's failure to verify the qualifications of HMS ran afoul of the RFP, the County Board's delegation of contract assignments to the Chief Procurement Officer strongly indicates that the County considers the identity and business structure of potential assignees of a contract to be immaterial at the time of the award of the contract. In particular, section 34-125 of the Procurement Code provides that the CPO has the authority to "execute an assignment . . . to a Contract," on her own, Ex. 33 at 5, that is, without obtaining County Board approval. In any event, the individuals involved in operating CBM Managed Services and CBM Premier are the same people, making this particular proposed assignment merely a change in form.

## 2. ARMI's MBE eligibility

In 2011, the County Board amended its M/WBE Ordinance to require a firm to be economically disadvantaged (as defined in the amended ordinance) to be eligible for M/WBE certification. It is undisputed that ARMI, one of CBM's M/WBE contractors and its only MBE contractor, does not meet this particular requirement for certification. Aramark contends that because ARMI cannot qualify as a Cook County MBE, CBM's utilization plan materially varied from the requirements of the RFP and thus required rejection by the County.

The RFP does not mandate strict compliance with the County's M/WBE goals as a precondition to award of the food services contract. Rather, Section 7.2.5 of the RFP requires a proposer to "demonstrate that it undertook good faith efforts to satisfy the [County M/WBE] participation goal." Ex. 42 at 62. As noted above, the Office of Contract Compliance, as a matter of course, does not do a thorough investigation of every subcontractor in a bidder's utilization plan until after a contract has been awarded. Instead, the Office's pre-award evaluation of a proposal's utilization plan is limited to ensuring that a proposer has made a good-faith effort to comply with the M/WBE goals listed in the RFP. That evaluation was done in this instance, although Hall conceded that she overlooked the difference between the County's MBE requirements and those of the City of Chicago, under which ARMI is currently certified as an MBE. Specifically, in her testimony at the hearing, Hall conceded that she missed the fact that the City's MBE requirements do not require an entity to be economically disadvantaged, a recently-added provision of the County's requirements.

Hall's credible testimony made it clear, however, that it is not unusual for a contractor to experience periods during which it does not comply with its M/WBE utilization plan. She testified that so long as the contractor engages in good faith efforts to comply, the noncompliance is immaterial. In addition, the language used in the RFP itself, which describes the M/WBE Ordinance as a "goal" to "continue to promote and expand" participation by those firms and requires only "good faith efforts" to use M/WBE firms in performing the contract, indicates that the utilization plan, like the M/WBE Ordinance itself, represents a goal, not a hard-and-fact requirement. Ex. 42 at 53 (Provision 4.15). In sum, there was no material variance.

In addition, as indicated in the Court's discussion of the facts, CBM's utilization plan is incorporated into its contract with the County, binding CBM to its commitment to use MBEs to provide thirty-six percent of the contract value. Ex. 17 at 5. The County and CBM are currently taking steps to rectify the defect resulting from ARMI's inability to obtain County M/WBE certification, but CBM remains contractually obligated to provide the levels of MBE participation it proposed. ARMI's failure to qualify does not affect the percentage of MBE participation that CBM proposed to provide, only the identity of the subcontractors that will participate. In any event, as noted earlier, there was credible testimony that the fact that CBM's utilization plan proposed a higher percentage of M/WBE participation than the County's stated goals did not have a material impact on the recommended award of the contract to CBM.

When considered in light of the level of deference required by Illinois common law, *see Bodine Elec.,* 305 Ill. App. 3d at 439, 711 N.E.2d at 477; *Williams Bros. Constr.*, 243 Ill. App. 3d at 957, 612 N.E.2d at 895, CBM's inclusion of ARMI in its

utilization plan despite its inability to qualify as an MBE does not amount to a material variance from the RFP requirements. In addition, in evaluating both CBM's and Aramark's utilization plans, the Office gave both plans the same level of preliminary review, and thus CBM did not have a "substantial advantage or benefit not enjoyed by other bidders." *Bodine Elec.*, 305 Ill.App.3d at 436, 711 N.E.2d at 475. Moreover, the inquiry that the County undertook in its preliminary review was reasonably sufficient to establish CBM's "good faith efforts" to meet the M/WBE Ordinance, the only requirement regarding M/WBE compliance that was listed in the RFP. Ex. 42 at 62 (Provision 7.2.5).

The preceding discussion establishes that if the standard is the material variance standard advocated by Aramark, it has failed to establish a likelihood of success on the merits. The same is true if the standard is the arbitrariness standard advocated by the County. The process that the County followed in awarding this contract represents the antithesis of arbitrariness. Both competing proposals were reviewed and evaluated carefully by procurement staff, and the evaluation committee considered and meticulously assessed both proposals against the bid requirements, and the County Board did the same. It is true that procurement staff made a mistake in failing to catch the fact that ARMI had been certified as an MBE contractor by a municipality whose requirements were less onerous than those of the County. But a mistake does not amount to arbitrariness. When asked to define the arbitrariness standard on the assumption that this was the standard to apply, counsel for both sides said that arbitrariness amounted to making a decision for no rational reason, or for no reason at all. If that is the standard, Aramark has failed to show any likelihood of success.

Because Aramark has not shown any likelihood of success on the merits of its claims as it defined them for purposes of the motion for preliminary injunction, the Court need not address the remaining requirements for issuance of a preliminary injunction.

**Conclusion**

For the reasons stated above, the Court denies Cook County's motion to dismiss [docket no. 15] and also denies Aramark's motion for a preliminary injunction [docket no. 18]. The case remains set for a status hearing on September 11, 2012 at 9:30 a.m.

_____
s/ Matthew F. Kennelly
MATTHEW F. KENNELLY
United States District Judge

Date: September 10, 2012